Approved: _____
MATTHEW L. SCHWARTZ
BENJAMIN A. NAFTALIS
Assistant United States Attorneys

ORIGINAL

**14 MAG 2031**

Before:   HONORABLE MICHAEL H. DOLINGER
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT FILED SEP 1 2 2014 S.D. OF N.Y.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

- v. -

DMITRY BRAVERMAN,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SEALED COMPLAINT

Violation of 15 U.S.C. §§ 78j(b) & 78ff;
and 17 C.F.R. §§ 240.10b-5 &
240.10b5-2

COUNTY OF OFFENSE:
NEW YORK

DOC # _____

SOUTHERN DISTRICT OF NEW YORK, ss.:

   SALVATORE G. CINCINELLI, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
(Securities Fraud)

   1.   From in or about September 2010, through at least in or about December 2013, in the Southern District of New York and elsewhere, DMITRY BRAVERMAN, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 140.10b5-2, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, on the basis of material, non-public information that BRAVERMAN obtained as part of his employment at a national law firm,

Case 1:14-mj-02031-UA   Document 1   Filed 09/12/14   Page 2 of 14

BRAVERMAN executed and caused to be executed, in the Southern District of New York and elsewhere, the securities transactions listed below:

| Approximate Dates of Purchases and Sales | Transaction | Approximate Profit (Loss) |
| --- | --- | --- |
| 9/28/2010 – 10/1/2010 | Purchase of 10 Gymboree Corp. call options | $4,416.93 |
| 1/27/2011 – 3/28/2011 | Purchase of 9,000 shares of drugstore.com, Inc. | $17,426.55 |
| 3/29/2011 – 4/4/2011 | Purchase of 785 shares of Epicor Software Corp. | $1,422.09 |
| 3/14/2011 – 4/6/2011 | Purchase of 100 shares and 50 call options of Seagate Technology PLC | ($10.20) |
| 11/21/2012 – 12/13/2012 | Purchase of 327 YM Biosciences, Inc. call options | $9,620.46 |
| 8/26/2013 – 9/5/2013 | Purchase of 1,170 Astex Pharmaceuticals, Inc. call options | $59,509.68 |
| 12/5/2013 – 12/20/2013 | Purchase of 1,062 Dealertrack Technologies, Inc. call options | $101,417.42 |
| 12/17/2013 – 12/26/2013 | Purchase of 1,243 Xyratex Ltd. call options | $102,716.87 |
|  | **Total** | $296,519.80 |

(Title 15, United States Code, Sections 78j(b) & 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2)

The basis for my knowledge and the foregoing charges is, in part, as follows:

2.      I have been a Special Agent of the FBI for approximately four years; before that, I worked for an international investment bank as well as for a major broker dealer registered with the Securities Exchange Commission ("SEC"). For approximately the last three years, I have been assigned to a squad specializing in securities fraud and other violations of the securities laws and related offenses.

Through my training, education, and experience, I have become familiar with the manner in which fraudulent schemes, including insider trading schemes, are operated. I have participated in numerous investigations of these offenses, and I have, among other things, made and participated in making arrests of numerous people for participating in such offenses.

3. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and people, including: (a) trading, telephone, and other records; (b) bank records; (c) documents obtained from other third parties, such as the law firm (the "Law Firm") at which DMITRY BRAVERMAN, the defendant, was at all relevant times employed; (d) publicly available information; (e) e-mails and other correspondence; (f) discussions with the SEC staff; and (g) interviews conducted by myself and others of various people. Because this affidavit is prepared for a limited purpose, I have not set forth each and every fact I have learned in connection with this investigation. Where this affidavit refers to the contents of documents, conversations with others, and events, they are related in substance and in part. Where figures and calculations are set forth herein, they are approximate.

## Relevant People and Entities

4. At all relevant times to this complaint, the Law Firm was a full-service law firm with more than a dozen offices throughout the world. The Law Firm holds itself out as having particular expertise in advising technology companies in connection with mergers and acquisitions. In 2013, for example, the Law Firm advised on more than 100 such mergers and acquisitions transactions, with a combined value approaching $20 billion.

5. DMITRY BRAVERMAN, the defendant, has been employed since approximately October 2000 in the Information Systems department of the Law Firm, where he currently holds the position of Senior Information Systems Engineer. According to representatives of the Law Firm, BRAVERMAN's primary job responsibility is to maintain and design software in connection with the Law Firm's finance function. A representative of the Law Firm has confirmed that BRAVERMAN has access to databases containing (a) information about new matters, (b) information for use in connection with conflict checks, including the names of clients and adverse parties, (c) time sheets, and (d) billing records. According to the representative from the Law Firm, BRAVERMAN's level of access would have given him access to information about the Law Firm's clients in potential merger and acquisition activity, as well information about the identities of the other parties to the potential deal.

6. At all times relevant to this complaint, Gymboree Corp. ("Gymboree") offered children's clothing and other retail products through stores, outlets, and on-line. Gymboree's securities traded under the symbol "GYMB" on the NASDAQ Stock Market LLC ("NASDAQ"), a global stock exchange headquartered in New York, New York.

7. At all times relevant to this complaint, drugstore.com, Inc. ("drugstore.com") was an on-line retailer of health, beauty, skincare, vision, and related products. Drugstore.com's securities traded under the symbol "DSCM" on the NASDAQ.

8. At all times relevant to this complaint, Epicor Software Corp. ("Epicor") was a software company serving the manufacturing, distribution, retail, service, and hospitality industries. Epicor's securities traded under the symbol "EPIC" on the NASDAQ.

9. At all times relevant to this complaint, Seagate Technology PLC ("Seagate") was a leading manufacturer of hard disk drives and other storage devices. Seagate's securities traded under the symbol "STX" on the NASDAQ.

10. At all times relevant to this complaint, YM Biosciences, Inc. ("YM Biosciences") was a pharmaceutical company specializing in the development of a treatment for bone marrow disorders. YM Biosciences' securities traded under the symbol "YMI" on the New York Stock Exchange ("NYSE"), a global stock exchange with its trading floor located in New York, New York.

11. At all times relevant to this complaint, Astex Pharmaceuticals, Inc. ("Astex") was a pharmaceutical company focused on the treatment of cancer and other applications in oncology. Astex's securities traded under the symbol "ASTX" on the NASDAQ.

12. At all times relevant to this complaint, Dealertrack Technologies ("Dealertrack") provided web-based software solutions for the automotive retail industry. Dealertrack's securities traded under the symbol "TRAK" on the NASDAQ.

13. At all times relevant to this complaint, Xyratex Ltd. ("Xyratex") was a provider of data storage technology. Xyratex's securities traded under the symbol "XRTX" on the NASDAQ.

### Summary of the Insider Trading Scheme

14. There is probable cause to believe that DMITRY BRAVERMAN, the defendant, has engaged in securities trading based on material, non-public

information ("inside information") concerning contemplated mergers and acquisitions deals on which the Law Firm was advising. As discussed below, as a result of his work at the Law Firm, BRAVERMAN had access to matter-opening, conflict check, billing, and other information that provided him access to information about potential mergers and acquisitions activities. As set forth below, BRAVERMAN engaged in at least four trades that were based on inside information during the years 2010 and 2011. There is also probable cause to believe that he tipped another person ("Individual-1"), who engaged in two of the same trades. In April 2011, however, BRAVERMAN and Individual-1 abruptly closed out the last of these trades on the same day that another employee of the Law Firm was arrested on separate insider trading charges. In November 2012, BRAVERMAN opened a new brokerage account and again began trading on the basis of inside information he obtained from the Law Firm. Between November 2012 and the present, BRAVERMAN engaged in at least four additional trades based on inside information. In total, BRAVERMAN made more than approximately $300,000 in profits from the trades between 2010 and the present.

### BRAVERMAN's Trades in 2010 and 2011

15. I know from reviewing documents produced by various brokerage companies the following:

    a. In or about May 2002, BRAVERMAN and his wife opened a joint brokerage account at Brokerage Firm-1. In the account opening documents, BRAVERMAN listed his employer as the Law Firm, and listed his job as "Programmer Analyst." BRAVERMAN also listed a personal e-mail address (the "Personal E-mail Address") as a point of contact.

    b. In or about February 2010, BRAVERMAN opened a brokerage account in his own name at Brokerage Firm-2. In the account opening documents, BRAVERMAN listed his employer as the Law Firm, and listed his job as "Info Systems Engineer." BRAVERMAN also maintained two other brokerage accounts at Brokerage Firm-2: (1) since 2008, a custodial account for his minor child, and (2) since 2005, a "Personal Choice Retirement Account," as part of the Law Firm's profit-sharing retirement plan, which was held in BRAVERMAN's own name. Except for the retirement account, which listed his business e-mail address at the Law Firm, BRAVERMAN's account opening documents at Brokerage Firm-2 listed the Personal E-mail Address as a point of contact.

    c. In or about 2008 and 2009, Individual-1 opened a series of brokerage accounts in his own name at Brokerage Firm-2. In account opening documents, Individual-1 listed a home address in Massachusetts, and identified himself as an "Engineer."

d. According to Brokerage Firm-2's compliance department, Brokerage Firm-2 contracts with UBS Securities LLC for equity and options order handling and execution. UBS Securities LLC manages the execution of most types of orders for which Brokerage Firm-2 customers have not provided specific instructions. According to Brokerage Firm-2's compliance department, the orders relating to trades at Brokerage Firm-2 discussed in this complaint were routed through UBS Securities LLC, in Manhattan.

16. From reviewing analyses of phone records, I am aware that BRAVERMAN and Individual-1 are – and have been throughout the relevant time period – in frequent telephonic contact.

### The Gymboree Trade

17. I know from reviewing documents produced by Brokerage Firm-2 that on or about September 28, 2010, BRAVERMAN purchased 10 Gymboree call options.[1] On or about October 1, 2010, BRAVERMAN sold all 10 call options, realizing actual profits of approximately $4,416.93.

18. According to publicly-available press reports, on or about September 30, 2010 – in between the time when BRAVERMAN bought and sold the Gymboree call options – the *Wall Street Journal* reported that Gymboree was exploring the possibility of a sale to a private equity firm. That same day, Gymboree's stock price closed 20 percent higher than the previous day, and its trading volume was approximately 350 percent higher than the previous day's volume. On or about October 11, 2010, Gymboree and Bain Capital announced that Bain planned to acquire Gymboree through a tender offer. The Law Firm represented Gymboree in the deal.

### The drugstore.com Trades

19. I know from reviewing documents produced by Brokerage Firm-2 that on or about January 27, 2011, March 22, 2011, and March 23, 2011, BRAVERMAN purchased a total of 9,000 shares of drugstore.com, Inc. From on or about March 24 through on or about March 28, 2011, BRAVERMAN sold all 9,000 shares, realizing actual profits of approximately $17,426.55.

20. According to publicly-available press reports, prior to the opening of the market on March 24, 2011 – in between the time when BRAVERMAN bought and sold the drugstore.com shares – Walgreens announced its planned acquisition

---

[1] Based on my training and experience, I know that a call option is an option to purchase stock at a particular price within a specified time period. Purchasing call options contracts is consistent with a belief that the price of the underlying security will increase.

of drugstore.com. drugstore.com's stock price closed 113 percent higher that day than on the previous day, and its trading volume was approximately 17,300 percent higher than the previous day's. The Law Firm represented drugstore.com in the deal.

### The Epicor Trades by BRAVERMAN and Individual-1

21. I know from reviewing documents produced by Brokerage Firm-1 and Brokerage Firm-2 that on or about March 29, 2011, BRAVERMAN purchased 785 shares of Epicor Software Corp. On March 25, 2011, and April 1, 2011, Individual-1 purchased a total of 463 shares of Epicor. On April 4, 2011, BRAVERMAN and Individual-1 both sold all of their shares in Epicor, realizing actual profits of approximately $1,422.09 and $709, respectively.

22. According to publicly-available press reports, prior to the opening of the market on April 4, 2011 – in between the time when BRAVERMAN and Individual-1 bought and sold their Epicor shares – Apax Partners announced its planned acquisition of Epicor through a tender offer. Epicor's stock price closed 11 percent higher that day than on the previous day, and its trading volume was approximately 3,980 percent higher than the previous day's. The Law Firm represented Epicor in the deal.

23. I know from reviewing an analysis of phone records that phone numbers belonging to BRAVERMAN and Individual-1 were in frequent contact throughout this time period. For example, the two communicated four times on the morning of March 25, 2011, prior to Individual-1's purchase of 400 Epicor shares later that day, and twice on the morning of April 1, 2011, prior to Individual-1's purchase of 63 Epicor shares later that day. Likewise, the two communicated more than once between the Apax announcement on the morning of April 4, 2011, and the time when Individual-1 sold his shares later that day.

### BRAVERMAN and Individual-1's Seagate Trade Is Cut Short by an Arrest

24. I know from reviewing documents produced by Brokerage Firm-1 and Brokerage Firm-2 that in March and April 2011, BRAVERMAN and Individual-1 engaged in multiple trades of stock and call options in Seagate Technology PLC. In total, BRAVERMAN bought 100 shares and 50 call options, and Individual-1 bought 15 call options in Seagate.

25. On or about April 6, 2011, the FBI arrested Matthew Kluger on insider trading charges. At the time of his arrest, Kluger was an associate attorney in the Washington, D.C., office of the Law Firm. According to the charges against him, Kluger traded on (and disseminated to others) inside information about mergers and acquisitions deals that the Law Firm was working on. News of Kluger's arrest

7

was publicly reported no later than approximately 9:00 AM (Eastern) on April 6, 2011.

26. That afternoon, BRAVERMAN liquidated his entire Seagate position, for a small loss. Two days later, Individual-1 liquidated his entire Seagate position, for a small gain. In between, phone records confirm that the two communicated at least twice.

27. On April 19, 2011 – after Kluger's arrest and after BRAVERMAN and Individual-1 had liquidated their positions – Seagate announced the launch of a strategic partnership with Samsung. Seagate was a client of the Law Firm.

### BRAVERMAN's Trades in 2012 and 2013

28. I know from reviewing documents produced by various brokerage firms, including Brokerage Firm-3, the following:

    a. In or about September 2012, an account at Brokerage Firm-3 was opened in the name of someone else ("Individual-2"). The account opening documents listed an address in Russia, but included the Personal E-Mail Address, which BRAVERMAN had used repeatedly since 2002, as discussed above.

    b. According to customer service records maintained by Brokerage Firm-3, someone using the Personal E-mail Address and claiming to be Individual-2 sent account-opening documents to Brokerage Firm-3 in September 2012, including copies of a Russian passport and a Russian national identification card. The account holder then wrote, referring to BRAVERMAN's home address, "This is my temp address in The USA, while I am travelling."

    c. The account at Brokerage Firm-3 (the "Individual-2 Brokerage Account") was funded with an initial $10,000 deposit on or about September 19, 2012. The funds were wired through Bank of America in Manhattan, and confirmation of the wire was sent to the Personal E-mail Address. The funds came from a Bank of America account that, according to account opening documents, was registered to BRAVERMAN's home address, although held in the name of Individual-2. According to Brokerage Firm-3 records, as of January 29, 2014, the initial $10,000 deposit was the only transfer of funds into the Individual-2 Brokerage Account.[2] According to the February 2014 account statement, the

---

[2] According to records from Bank of America for the account in Individual-2's name, the account was opened in August 2012, and over a four day period in September 2012 was funded with $10,200 in cash deposits made at ATMs near BRAVERMAN's home in California. Less than a week after the final cash deposit, the Bank of America account wired $10,000, through Manhattan, to fund the Individual-2 Brokerage Account. Records from the Bank of America account show

8

Individual-2 Brokerage Account held approximately $246,121.34 in cash, and less than $10 in securities, which was the proceeds of the trades described below.

        d.      On or about December 11, 2012, the e-mail address on the Brokerage Firm-3 account was changed at the account holder's request from the Personal E-mail address to something else.

29.     According to immigration documents, Individual-2 entered the United States at John F. Kennedy Airport in late July 2012, listing BRAVERMAN's home address as his ultimate destination. Individual-2 departed the United States on or about October 27, 2012, and did not return again until on or about December 26, 2013 (departing on or about January 30, 2014). Based on my review of analyses of phone and IP records, all of the trading in the Individual-2 Brokerage Account described in the following paragraphs (*i.e.*, paragraphs 30 through 37) appears to have been executed from BRAVERMAN's home in California, at a time when Individual-2 was not in the country. Specifically, all of the relevant trading took place after October 27, 2012, and on or before December 26, 2013, and all of the IP addresses used to log into the Individual-2 Brokerage Account to execute the relevant trades were assigned to internet service accounts held in the name of BRAVERMAN or his wife at their California home.

### The YM Biosciences Trade

30.     I know from reviewing documents produced by Brokerage Firm-3 that from on or about November 21, 2012, through on or about December 11, 2012, a total of 327 YM Biosciences call options were purchased in the Individual-2 Brokerage Account. On or about December 12 and 13, 2012, that entire position was liquidated, for a total realized profit of approximately $9,620.46.

31.     According to publicly-available press reports, prior to the opening of the market on December 12, 2012 – in between the time when the options were bought and sold – Gilead Sciences announced its planned acquisition of YM Biosciences. YM Bioscience's stock price closed approximately 76 percent higher that day than on the previous day, and its trading volume was approximately 9,101 percent higher than the previous day's. The Law Firm represented Gilead Sciences in the deal.

---

periodic ATM deposits between late 2012 and the present, including during periods when Individual-2 was (according to immigration records) in Russia. For example, in November 2012, bank records show that $2,100 in cash was deposited into the Individual-2 Bank of America account, even though Individual-2 was not in the country.

### The Astex Trade

32.     I know from reviewing documents produced by Brokerage Firm-3 that from on or about August 26, 2013, through on or about September 4, 2013, a total of approximately 1,170 Astex Pharmaceuticals call options were purchased in the Individual-2 Brokerage Account. On September 5 and September 12, 2013, the entire remaining position was liquidated, realizing a total profit of approximately $59,509.68.

33.     According to publicly-available press reports, prior to the opening of the market on September 5, 2013 – in between the time when the options were bought and sold – Otsuka Pharmaceuticals announced its planned acquisition of Astex. On September 4, 2013, Astex's stock price closed 23.8 percent higher than the previous day's close, and its trading volume was approximately 958 percent higher than the previous day's. On September 5, 2013, Astex's stock price closed an additional 3.4 percent higher, with a volume increase of 230 percent. The Law Firm represented Astex in the deal.

### The Dealertrack Trade

34.     I know from reviewing documents produced by Brokerage Firm-3 that from on or about December 5, 2013, through on or about December 18, 2013, a total of 1,062 Dealertrack Technologies call options were purchased in the Individual-2 Brokerage Account. On or about December 20, 2013, that entire position was liquidated, for a total realized profit of approximately $101,417.42.

35.     According to publicly-available press reports, after the close of the market on December 19, 2013 – in between the time the options were bought and sold – Dealertrack announced its planned acquisition of Dealer.com. Dealertrack's stock price closed approximately 12.6 percent higher that day than on the previous day, and its trading volume was approximately 834 percent higher than the previous day's. The Law Firm represented Dealer.com in the deal.

### The Xyratex Trade

36.     I know from reviewing documents produced by Brokerage Firm-3 that from on or about December 17, 2013, through on or about December 20, 2013, a total of 1,243 Xyratex Ltd. call options were purchased in the Individual-2 Brokerage Account. On or about December 23 and December 26, 2013, the entire remaining position was liquidated, for a total realized profit of approximately $102,716.87.

37.     According to publicly-available press reports, prior to the opening of the market on December 23, 2013 – in between the time when the options were

bought and sold[3] – Seagate announced its planned acquisition of Xyratex. Xyratex's stock price closed approximately 27 percent higher that day than on the previous day, and its trading volume was approximately 7,073 percent higher than the previous day's. The Law Firm represented Seagate in the deal.

38. I know the following from speaking with representatives of the Law Firm and reviewing documents provided by the Law Firm:

a. The Law Firm in fact participated in each of the deals described above, as was publicly reported. Information about the deals was privileged and confidential prior to each deal's announcement, and the Law Firm had already begun working on each of the deals at the time that BRAVERMAN (or Individual-1) engaged in the trading described above.

b. At all times relevant to this complaint, the Law Firm's policies prohibited the unauthorized disclosure of its client's privileged and/or material, non-public information to any third party. Based on communications with a representative of the Law Firm, I have learned that the status of the mergers and acquisitions described above, prior to their public announcement, were confidential to the Law Firm and its clients; were treated as privileged and confidential; and were of value to the Law Firm and its clients.

c. Based on my review of documents from the Law Firm, I have learned that, since approximately 2007, the Law Firm's written employee handbook contained an "Appendix B: Confidentiality & Insider Trading," containing the "Firm Policy Regarding Confidentiality of Client Information." That policy stated, in substance and in part, that "[c]lient information should not be disclosed to any person other than to persons in the Firm engaged in the representation of such clients of who otherwise have a legitimate need to know. For this purpose, all information obtained in the course of representation of a client should be regarded as confidential unless, beyond any doubt, it is publicly known and its disclosure would not adversely affect the client." The policy further provided:

> It is the policy of the Firm that it does not permit trading in securities about which the Firm has Material, Non-Public Information (whether or not the company is a client of the Firm) by an attorney, other employee or any third party who acquires such information through the Firm. Even if such person does not believe he or she is in possession of Material, Non-Public Information, such person should not engage in any securities transaction

---

[3] The Individual-2 Brokerage Account sold a small tranche of 300 Xyratex call options on December 20, 2013, prior to the deal announcement. That trade realized a loss of approximately $1,665.

11

> unless and until the policies and procedures set forth herein have been followed.
>
> ### Prohibition on Insider Trading
>
> No employee shall engage in any transaction involving the securities of a company about which the employee has Material, Non-Public Information obtained through the Firm. . . . Material Information means any type of information that one should reasonable expect would have a significant effect on a company's stock price, revenues, earnings, product development, business prospects or corporate organization. In general, a test for whether information is Material is to ask yourself if you know something a person buying or selling a security of a company would want to know before engaging in the transaction. If the answer is "Yes," or even "Perhaps," you should refrain from trading. . . . Attorneys and other employees of the Firm should presume, as a rule, that all information they obtain through the Firm about a company is material. The information should also be presumed not have been disclosed to the public.

The Law Firm's policy also provided that "An employee must <u>always</u> clear any trade involving securities of one of the Firm's clients with one of the Responsible Members for that client." Further, the Law Firm's policy contained an absolute prohibition on engaging in options trading in the securities of clients: "No attorney or other employee of the Firm shall sell short or engage in transactions in put or call options or other similarly 'leveraged' transactions with respect to securities of clients, whether or not such person believes he or she is in possession of Material, Non-Public Information." Finally, the Law Firm's policy contained the following warning:

> EMPLOYEES OF THE FIRM MAY BE SUBJECT TO CRIMINAL AND CIVIL LIABILITY FOR ENGAGING IN TRANSACTIONS IN THE SECURITIES OF COMPANIES ABOUT WHICH THE FIRM HAS MATERIAL, NON-PUBLIC INFORMATION (WHETHER OR NOT A CLIENT OF THE FIRM) AT A TIME WHEN SUCH INFORMATION IS KNOWN TO SUCH PERSON.

        d.     In addition, each employee entered into a written agreement with the Law Firm that incorporated the provisions of the employee handbook,

including the above-quoted Appendix B. The written agreement also contains its own Exhibit D, which contains virtually identical language.

         e.     Prior to 2007, the Law Firm's compliance policy was contained in a separate document, entitled "Confidentiality of Client Information and Restrictions on Trading in Securities of Clients and Others." The pre-2007 policy contained all of the same elements as the post-2007 policy, including, verbatim, the provisions quoted in paragraph 40(d).

         f.     All of the Law Firm's employees were required to sign an attestation that they had read and understood the Law Firm's policies prohibiting the misuse of inside information. BRAVERMAN executed such an attestation dated October 9, 2000, at or about the time that he was first employed by the Law Firm.

         g.     Further, after Matthew Kluger's arrest in April 2011, the Law Firm's General Counsel sent an e-mail to all employees of the Law Firm discussing the arrest. In that e-mail, the General Counsel reiterated that the Law Firm has "in place strong policies on confidentiality, insider trading, privacy and security and a code of business conduct. Each of us is bound by these policies as an employee of the firm." The (post-2007 version of the) policies were then attached to the e-mail. The e-mail concluded that, "In light of the alleged misconduct of the firm's former associate, it is appropriate that each of us reaffirm our commitment to comply with these policies."

         h.     In an e-mail dated April 18, 2011, at approximately 10:17 AM, BRAVERMAN electronically acknowledged and agreed to reaffirm his commitment to comply with the Law Firm's policies.

         i.     With respect to employee requests to trade in the securities of Law Firm clients, I understand from speaking with a representative of the Law Firm that such requests are maintained in a database, and also generate e-mails to one of the attorneys responsible for the client relationship. Because BRAVERMAN has access to the database containing those requests, the Law Firm has not queried it to confirm whether BRAVERMAN has ever requested securities trading pre-clearance so as not to alert him to the investigation. However, the Law Firm has reviewed archives of the relevant lawyers' e-mails (to which BRAVERMAN does not have access) as well as BRAVERMAN's own e-mails, and has confirmed that BRAVERMAN did not request to engage in any of the transactions described in this complaint.

WHEREFORE, I respectfully request that an arrest warrant be issued for DMITRY BRAVERMAN, the defendant, and that he be imprisoned or bailed, as the case may be.

SALVATORE G. CINCINELLI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
12th day of September, 2014.

HON. MICHAEL H. DOLINGER
United States Magistrate Judge
Southern District of New York